The morning is BARCHEERS v. ALAMEIDA. Thank you, Your Honors. Good morning. Patrick Ford on behalf of the appellant, Daniel Barcheers. May it please the Court. I'd like to address, focus my argument this morning on the issue of the voluntariness of the confession, of Ms. Barcheers' confession. I'm happy to answer questions on the other issues, but I think that the voluntariness of the confession is at the heart of this case. I'd like to raise a couple of preliminary and what I feel to be important points regarding the nature of the issue, then address the violation, and then seek to determine whether there's anything in the AEDPA which would prevent relief in this case. The first point that I'd like to raise, and I think it's important to know, is that appellate review is especially important on the issue of voluntariness because the way it presents itself, it's almost always attached to the issue of a potential Miranda violation, and therefore it's set up, the way I see it, as something of a compromise issue. When you find a difficult fact pattern in terms of improper police conduct, you often see when you read these cases, if the court will go ahead and make the finding of a Miranda violation, that the dynamics kind of change at that point. The defense lawyer seems to be happy, the prosecutor seems to be unhappy, and the court seems to exhale, and there's kind of an instinct for mediation, perhaps. But you see, typically, the court will simply say, oh, and regarding the voluntariness issue, I'm going to find that the statement was voluntary. And that seems to be how the issue often arises. So we think that the issue by itself kind of sets itself up for the back side of a, the negative side of a compromise. The second point that I'd like to emphasize is the reason for the rule that we exclude the evidence for all purposes when we are determining voluntariness is because of the likelihood that these statements are unreliable. We often find a person that is subject to, vulnerable to coercion that goes ahead after a certain amount of time and pressure from the police, and will go ahead and say what the officer wants to hear in order to stop the interrogation. And so what ends up happening is the trial court often thinks that if he or she makes a ruling on voluntariness, that it will somehow encourage the defendant to commit perjury at trial, but it's quite the opposite. What happens is that a person who's made an unreliable and perhaps untruthful statement initially will be prevented from testifying for fear of being impeached with a false statement. And while that dynamic might further the chances of conviction, it does not further the truth-finding process itself. And so I just wanted to make those points. Regarding... Are we limited by the Anti-Terrorist Act, this court? We're going to, and I can address it now certainly, Your Honor. The way I understand the AEDPA, and it's a difficult statute for those of us that don't practice regularly in the federal courts, it's often mischaracterized as a standard of review option, when in fact what I think it is, fairly characterized as whether or not it's an obstacle to prevent relief, which is the way I've characterized it initially. We go ahead and see whether there's a violation. In cases where there are factual disputes, certainly the deference portion of the AEDPA becomes relevant. Here we don't have that situation so much because the trial court made nine findings, demonstrating the fact that the statement was involuntary. So we don't have to worry quite so much about the deference portion of it. And we're limited to asking ourselves whether or not under 2254 D.1, the state court's application of the Supreme Court precedent was unreasonable. And we'll get to that in a second. So certainly that's a portion of the analysis, but ultimately we're going to suggest to this court that the finding of voluntariness is a legal issue once there are no factual matters in dispute. And it's for this court under Thompson v. I believe it's Kehoe-Hane to go ahead and make its independent ruling on that issue. The question before the court in this case is whether or not the appellant's statements were a product of her own free choice or whether they were somehow a function of improper coaxing on the part of the police in other circumstances. The Supreme Court tells us they give us, they tell us in looking at the issue we're to look to determine first whether or not the suspect was particularly vulnerable to this kind of coercion. And secondly, whether or not the circumstances and police conduct were such that they might overbear a reluctant person's free will. The courts give us essentially a laundry list of factors that we can use in making the determination. And we would suggest that in this case we can almost tick off the factors as they've been given to us by the courts. Ms. Barchier was a person, youth is an important factor. She was young. She was not experienced in matters with the police. She had severe psychiatric disorders. She was physically injured at the time of the statements, both by virtue of having been in a serious car crash and also having been literally chewed up three or four portions of her body by the police dogs. We would suggest it's our position certainly that she would be something of a poster child for someone who would be vulnerable to coercion. And then we ask the second part of it, and that is were there any other circumstances regarding the details of the interrogation or were there things that the police did that were improper to further the analysis. Regarding an additional circumstance of the interrogation, it would be that it took place in the middle of the night and she had been up for 24 hours at the time. This is a recognized factor. Regarding the police conduct in this situation, we would point to the fact that there were liberties taken from the officers regarding the Miranda requirements. The police told her while she was at the hospital that medical treatment was going to be withheld until after the statement. The police did not notify her parents, as they were required to do by law. The legislature in California has decided that that's such an important fact that they will criminalize the absence of that telephone call by the police. One second. Can you tell me where in the record the statement is that they would withhold medical treatment until after the questioning? I believe it's, I'm quite sure I've cited it in the brief, Your Honor. All right. If you haven't cited the place in the brief, that's all right, unless you can find it offhand. I don't want to delay your argument. Your Honor, I'm actually, if I may, I'd just as soon look for it when I sit down, and I will report back. So we believe that this is a strong case, and again, perhaps I should have mentioned this initially, the initial query as to whether or not she was willing to talk. When we incorporate all the factors regarding her vulnerability and the things that the police did, we also need to look at them in terms of the fact that this is a person who about three dozen times informed the police that she could not and did not wish to speak about this. And I'd like to just, one quote I think is particularly telling on this point, when Detective Grappoli was going on and on with her, telling her how she could help herself. And this is at page 86 of our excerpts. It says, I'm sorry to say it to you that way, meaning that the victim, he told her at this point, after suggesting that the victim was perhaps alive in the hospital, he then changed and said she's dead, and this is your chance to help yourself. I'm sorry to say it to you that way, but you don't want to say anything about anything, and it's real important to bail yourself out right now. So this is the detective is telling her during the course of the interrogation, he's frustrated by her not wanting to say anything. You don't want to say anything about anything, and I believe that that's important. So we think that this is a situation where there's an aggravated case of a violation. Now getting to the AEDPA analysis, I've heard it referred to different ways. AEDPA I refer to as AEDPA. Again, the important question is whether, in this case, it's not a question of contrary to, and counsels discussed in the district court incorporated into the analysis quite a bit about the deference regarding factual findings and so forth, but I think that we can pretty clearly look at this issue in terms of whether or not there was an unreasonable application of the Supreme Court authority. The courts tell us that there's a few circumstances and things that we can look at in determining whether or not the state courts were unreasonable. They say, look to see, first of all, whether or not the state court ignored some important factors in making its decision. Look to determine whether or not the court incorporated false facts in rendering its conclusion, or you can look to determine whether or not the court used irrelevant facts. In those circumstances, the application of the state court, the Supreme Court authority, would be unreasonable. In this case, it's a little bit of a hybrid issue, and that's certainly not an exclusive list, but we've got a situation where the state court, as it had to, acknowledged all these improper factors, but then curiously reached a conclusion which seemed to ignore them. The court said in its opinion, we understand that this was a youthful suspect, and that certainly as a person who had just turned 15 years old, youth is a factor that would favor a finding of involuntariness, but we don't think that she was that young that she couldn't. It wasn't. It didn't by itself render the statements involuntary. In fact, in the court's opinion at page 20, I believe it was, the court referred to the fact that she was old enough to have been able to assert her right to counsel, which it later, of course, said that the statements that she'd made were not an invocation of counsel, but the court was using it at that point to say that she was, the youth by itself was not determinative. Then the court said, well, yes, she was inexperienced, but we don't find that to be controlling here. And they said, yes, she certainly had these psychiatric disorders, that's clear, but counsel hasn't pointed us to a case in which such psychiatric disorders will render the confession involuntary. And it went on the same thing with the injuries. It said, yes, of course, she was bleeding and she was in pain, but not the kind of pain that would render it involuntary. And, yes, it was in the middle of the night, and, yes, she was yawning, she'd been up for 24 hours, but we don't think that she's demonstrated, it didn't look to us like she was actually falling asleep at the time. And, yes, the police didn't call her mother, and, yes, the police did these things, but you know what, those things don't require, they don't equate to a finding of involuntariness. And we would suggest to this Court that essentially what the Court did in that case was to say it would be looking at it, to look at this in terms of the totality of the circumstances, and it would be as if the Court had a bowl of soup in front of it. And the question was to determine whether or not that was vegetable soup. And the Court said, well, it plucked out a carrot and said, this is clearly a carrot, but we're finding that a carrot does not amount to vegetable soup. And this is a potato for sure, but a potato is not vegetable soup. And this is broth, which by itself is not vegetable soup, and celery and so on and so forth. And it's probably a poor analogy, but it's something that I think is applicable here. And at the end of the day, the Court reached the decision that what was in front of it, while all these ingredients were certainly there, that what was in front of it was something other than vegetable soup, or that counsel hadn't presented cases showing that a carrot equals vegetable soup or something along those lines. We believe that in that circumstance, the Court's application of the Supreme Court law was unreasonable. There were two facts that the Court mentioned in support of its ruling findings that we think we can rebut, and this goes to the AEDPA. I don't believe that it's necessary to do so in light of the fact that the analysis in misapplying the nine factors of coercion were so clearly demonstrated. But I just wanted to touch upon them. The first was whether or not the police lied to Ms. Barchier's. The trial court found that she did not, that the police did not. And we would point to the fact that they initially suggested that the victim was alive, and then of course she was not. That was a lie. They told her that she could help herself and save her bacon by admitting an intent to commit robbery. This, of course, was a lie. If she had done that, she would have been guilty of first-degree murder under the felony murder rule. They lied to her mother, clearly. And this was a situation where we think that the evidence rebuts that. The other fact that they referred to was the fact that she seemed coherent at the time. And I think that's a very dangerous – I'd just like to address that. It was also the – it was the only fact used by the State Court in reaching its conclusion of voluntariness that they – that the court had viewed the tape, and together with the detective's testimony, they found that she was coherent at the time. We would suggest the detective himself told Ms. Barchier's in his second interview – the second day, I should say, of interviews that she was not coherent on the first day. He said that you seemed – are you okay today? Yesterday you seemed like you were in the ozone, he said. And that goes along with some of the conclusions regarding her statements to the probation officer and to other people, too, that she was – that she was not altogether there. We'd also suggest – You mentioned the tape. Exactly what recording is there of the questioning? Is there an audio tape, video tape? There's an audio – there's a video tape, Your Honor. I'm sorry. And is it – does the taping cover all of the interrogation at the police station or – The taping – the videotaping covers only the interrogation at the police station, not at the hospital. Another factor that I should mention was at the hospital. This was a girl who was handcuffed to a gurney and her hospital gown and so forth that wasn't set up for that kind of taping. So – and nor would it have been, I suggest, in the interest of the detective to have recorded it at that point. Counsel, wasn't there testimony at the time of the incident that took place that she took a piece of jewelry from the victim and put it on herself? Right. And I think that gets to – yes, and that came, I believe, from the – either from the detectives or from the young girls. She also made statements, and I think that gets to the issue of prejudice. I'd like to – but yes, she did make that statement. And I think her boyfriend took a watch off of that thing. Yes, there were items that were taken. And put that on himself? Right. At the incident itself? Right. There were things that were taken. They certainly stole the woman's car as well, and that was the car that they had crashed into the bank building. There – before I go on, there's just one more legal conclusion on the part of the court that, again, I don't think it's necessary to resolve the issue, but I think it gives you the frame of mind of the state court in reaching this decision. This is a state court who, by the way, had previously reversed the conviction on one occasion. And it's arguable whether it may have impacted its decision to reverse this for a second time. I don't know. And I put that out there for what it's worth. But we had suggested in our briefing that these repeated comments on the part of the police that this is the time to help yourself right now. You can help yourself if you talk to us. But this was in the nature of an implied promise of leniency. And the state court, in its opinion, wrote that – they cited us to the cases that say – and people familiar with this issue see it oftentimes – that the police weren't really promising anything. All they were doing was suggesting to the suspect that if you tell the truth, it might make you feel better or something along those lines, that that's not legally – that doesn't constitute a promise of leniency. And we would just suggest to the extent that the court relied on that line of cases that it was incorrect. And I'll just read one out of pages of these. Detective Grappoli said to her, yeah, you're – this is at page 84 of the excerpts. And you're in big trouble. And yeah, you're in such big trouble that this is the only time that you can help yourself. Because if you don't tell me, you know, what this situation is or what happened over there, you're in big trouble. I would suggest that this is more than someone suggesting that if you tell the truth, it's likely to make you feel better. That this was a suggestion, much like in Collazo v. Estelle, that you will be harmed if you don't talk to us and you can receive a benefit if you do talk to us. Now, the final question, assuming that we make – we can get to the point of – that the court has unreasonably applied the state court law, we still have to address prejudice under the ADPA. We have to determine whether or not the state can show that the injury was not substantial and injurious, that the error. We'd suggest that this was – it was quite important that she be able to testify. This ruling prevented her from testifying functionally. This was a case that was difficult – this is a difficult defense to try and convey to a jury that this person could not form the intent to commit robbery or to commit murder because she was psychologically dependent on this evil boyfriend. This was something she needed. This was certainly the case, and the case can strongly be made in this circumstance, but it's difficult to – for jurors, I should imagine, not to think that two people that went and did these things didn't have these independent thoughts. And because she was so horribly mistreated throughout her life, and mistreated by this boy in particular who was older and a bad guy, it was important for her – for the jury to listen to her and to form its opinion as to whether or not she was so psychologically dependent that it impacted on her ability to form the intent. Was that presented to the jury during the trial? It was, Your Honor, but through the – The jury heard about her psychological needs and so on. In this trial, as opposed to the first trial, in which they didn't. They did hear that, but the second – Through the psychiatrist? Correct. But then they heard through the psychiatrist, the second – He was the one that was impeached with the – Right. And the problem there was – Or where they used the impeachment. They were allowed to introduce through this psychiatrist that she had made the claim to the police that she had intended to commit the robbery, which was made after dozens of denials on this point, and it was extremely inflammatory. So it was a difficult – it was very prejudicial. Also, they got the tag along with the gratuitous comment regarding that it felt good to kill somebody. But the State will say that because she made these statements to the young girls that she – that there was no harm. And we would suggest that the statements – first of all, this is derivative evidence, which the Supreme Court tells us in questions of voluntary. When there's an involuntary statement, derivative evidence, as opposed to situations where the statements are voluntary, the derivative evidence is not admissible. But the jury heard the entire psychological problems that she's been facing since she's been born? The jury had gotten – had been given that information. Correct. What was her background from the date of birth? From the date she was two years old. Okay. And when this torture began, I – Go ahead. Okay. I'd just like to complete my point about the juvenile witnesses, because I think it's important, and I think it's the only thing that the State and the State court relied on it in finding – assuming that there was error, that it was harmless. Initially, we believed that it was derivative evidence. And secondly, the evidence was quite overstated by the witnesses. They testified that she was bragging about certain things when they saw her at the juvenile hall and so forth, and that this was not a person necessarily who was what the doctor had suggested that she might be. Keep in mind that during – under cross-examination, these witnesses admitted that they essentially embellished this testimony, that when they talked to the police initially, they had said, you know, first we thought that she was bragging about what she was doing, but then we realized that there was something much deeper that this had to do with her love for and fear of her boyfriend in this complicated relationship. These were girls who approached her. They had knowledge of the incident. They were pressing her for details. She was in – I can't tell you what psychological state she was in, but the evidence suggests that she was in a heightened state of psychosis at the time of this, which lasted several days, and she was saying remarkable things, delusional things, talking about blood being all over her sweater and this and that, when it wasn't the case. She was in this heightened state. So we believe that because the girls embellished their testimony, that was shown to be the case and that that's – will not render the egregious error regarding the court's ruling to be harmless. Thank you. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court, Anthony DaSilva, Deputy Attorney General Counsel for Respondent. And the Anti-Terrorism and Effective Death Penalty Act, AEDPA, does govern the review of this petition, Your Honor. And it governs not only with regard to legal conclusions, but also the findings of fact. It is our position that under 2254d2, when a petitioner, such as in this case, challenges the State Court's findings based entirely on the State Court record, this Court must give particularly higher deferential review to those findings, Your Honor. In fact, even though the voluntariness of the confession itself may be a legal question, the State Court's findings that no threats or promises were made in connection with the confession is essentially a factual conclusion which is entitled to presumption of correctness. And this Court has held that. And it was an approach that was followed by the district court. Those findings of facts were not rebutted by clearing convincing evidence by the petitioner in this case. And therefore, they must stand. It's the finding that the police did not lie. I'd like you to focus on that one in particular. Yes, Your Honor. I don't think it's taken as literally as it seems. I think the trial court found that the police did not lie in a way that had been sanctioned in other cases or U.S. Supreme Court cases. And the United States Supreme Court has indicated that use of subterfuge sometimes in questioning is okay. So I think the fact that if you're going to take a literal meaning of they did not lie, that's not what the court was meaning. It was in a way that was not sanctioned in prior cases. And the court took into consideration the statements but also all the factors that the petitioner had alluded to in making its conclusion that under the totality of the circumstances, her statements were voluntary and not coerced. How about the fact that she was a psychological cripple, if we believe that? Well, Your Honor, that. A cripple, she couldn't deal with this problem at all and the psychosis took over. That was considered as well, Your Honor. And her responses to the police questioning were found to be thoughtful and coherent. There were times where she claimed that she couldn't remember, but then later gave very detailed responses to police questioning. The statement about her being in the ozone, that was in response actually to her statement that it was starting to sink in. She first said she was in trouble and then later said that it was starting to sink in that she had committed murder. And that's what that statement alluded to, not to the entire, her entire demeanor throughout the questioning, as was found by the court of appeal and the district court. Can you tell me why you think this case is not controlled by Taylor v. Maddox and why a fortiori this is involuntary? Yes, Your Honor. I believe Taylor v. Maddox is distinguishable. Both factually and in what occurred in Taylor v. Maddox, there was a denial of involvement for two and a half hours before a final confession here. There was no initial denial of involvement. In fact, Barchier stated that she was in trouble and then continued with her story. Also, Taylor v. Maddox involves the failure to consider a factor which was the testimony of another witness that corroborated some of the testimony of the youth here. Well, I'm talking about the involuntary in this, but looking at the factors which are the length of the interrogation, location, continuity, defendant's maturity, education, physical condition, and mental health. The comparison is Taylor is a 16-year-old male. Barchier's is just four days past the female, four days past her 14 years old. Both arrested late at night, three-hour interrogation in Taylor until 3 a.m., considerably longer in Barchier's until after morning. Both desperate and upset, she was crying constantly. He was told it was a grim future if no confession. She was told it was the only way to save her bacon. The Taylor court emphasized that no lawyer or parent was permitted to be there or was present. Here, no lawyer or parent was present and the mother was lied to. Taylor had no food, water, or rest break. There's nothing on the record here about that. Taylor signed a Miranda form. She got an inadequate warning. In addition to those factors, which are to some extent common, although it appears worse in Barchier's, she had mental problems where hospitalization had been recommended a week or two before. She had a lifetime of sexual assaults by older men and authority figures. Taylor mentioned that the men who questioned her, him, were larger and authority figures. She had a sexual lifetime of sexual assault by authority figures, and she was suffering from wounds inflicted by police dogs. How, in what way is this not a stronger case than Taylor? In various ways, Your Honor. If you just look at those factors alone and not take the totality of the circumstances, again, the fact that you could have another conclusion wouldn't necessarily give them relief as long as what was – what occurred here was objectively reasonable. Now, Taylor is an advocate. I'm sorry, Your Honor? Taylor is an advocate. Okay. So we're talking about whether the decision of involuntariness is objectively unreasonable. But here the factor of age. We do have a 15-year-old who was attending the ninth grade, but there was no evidence that she was of below normal intelligence or lack of maturity. No. In Taylor, who was 16, there's no evidence of that either. Okay. But here, Your Honor – Your Honor, I can just tell you what the trial court came up with here. I mean, the age alone is not enough. Yes. That's – That's a factor. That's not enough. And yet, again, the trial court found that she didn't have below normal intelligence or maturity level, and she did show some level of sophistication. The injuries – Taylor had a prior record in contact with the police. She did not, as far as I know. No, but she had run away, and that was a factor to be considered. And she did make statements asking for an attorney. Regarding the injuries, here – As did Taylor. As did Taylor. I'm trying to compare the two, and so far I'm not hearing anything that you're saying that would not make Taylor applicable. I mean, you're saying she's 14, but she's not an unusually immature 14. Taylor's 16 and not an unusually immature 16. She asked for a lawyer. Taylor asked for a lawyer. What is it? I mean, our precedent says that the circumstances in Taylor constitute involuntariness. And what I'm trying to find out from you is in what way are the circumstances here not greater than the – not more – do not tend more toward involuntariness than the circumstances in Taylor. Again, I believe it's a totality of the circumstances, Your Honor. If you look at what occurred, again, with the injuries and the mental disorders, she didn't appear to be in pain. She was not disoriented during the interviews. She did not request medical attention at the hospital. Regarding the dog bite wounds, she mentioned that they were gross. When they said they'd give her a band-aid, she said okay. In fact, right before she was caught when the car crashed, she was able to jump out of the car, run away from the police for some distance. And Dr. Maloney, on his cross-examination, admitted in her mental state and behavior, was consistent with someone who understood the nature of the questioning. Alcohol. She talked about consumption of a small amount of alcohol and lack of sleep. But the trial court found they didn't contribute to the finding of involuntariness because, again, she had a normal reaction of her pupil to light. Her speech was normal. There was no indication it had any effect on her ability to answer the questions. The blood test was negative on the presence of any drugs or alcohol. Dr. Maloney testified there were no behavioral signs of intoxication. And there was no difficulty staying awake during the interviews. The only difficulty she may have had was waiting for Victor. She yawned one or two times. The interviews were late at night, but they were close in time to the murders. Regarding the parental notification, she never asked to see her parents. There's no evidence that it somehow induced her to give incriminating statements to the police. She asked, don't I get to speak to a lawyer? I thought you were using that as a sign of her sophistication. She knew about lawyers in one of them. That's potentially that could be taken as a sign of sophistication, Your Honor. Just as in Taylor. They could, Your Honor. But I think they were also taken in the overall picture. And then here the police statements. Again, they were seen as not promises of leniency. And so the fact that you could come to another reasonable conclusion does not entitle Barteers to habeas relief under the EDPA. Let me ask you to stop there. In particular, the officer's statements that this is the only time you can help yourself and it's only your bacon you're saving right now. It's nobody else's. Isn't that suggesting that she'd better talk if she wants to make it easier on herself? It's not directly talk and we'll let you off. But there does seem to be some degree of inducement there that it's going to be better for you if you talk. And in a context where the intent to rob turns out to be the critical issue, that seems to say in some at some level, put your head into the noose by telling us that you intended to rob this lady. I think, Your Honor, the context, too, was we've talked to the others. They might be giving us a different story. They might be hanging you out to dry. And so in that context. Was that true? Had they talked to the others at that point? I believe they had talked to the others at that point. It couldn't have been others, plural. At that point, they didn't know the third person was. They didn't know who the third person was. But the third person was Mr. Hubble, who kind of came along for the ride and was involved in the crash and had run. And he was in the car with Mr. Victor. There was a person there, but the police had not talked. He hadn't even identified that person at that point. So couldn't I think that's correct. But the third person was Mr. Hubble at that time. So I believe that it was in that context. Regarding the intent to rob, there was physical evidence, Your Honors, that showed that she was involved in the robbery. No, that's not that shows that she participated. No doubt about that. When she got in, the question was, did she come into the house with an intent to rob? Yes, Your Honor. That that that may be a question. But she was also liable for first degree murder. First degree murder maybe is a direct perpetrator as an aider and a better. There were various theories that were discussed to the jury. And and again, you also have to clearly what it was the jury came back with. I mean, I may have seen it here. I've forgotten. Is there a jury verdict for anything that clearly indicates what theory it is that the jury relied upon? I don't believe so. So it may have been that they relied upon what you suggested, but it's just as possible they relied upon what Drinehart suggested. It's possible, Your Honor. It is our contention that it was objectively reasonable for the district court to conclude that there was no unreasonable application. Secondly, even if this court were to find that there was an erroneous determination, there is harmless error in this case. And again, not only because of the statements that were made to the juveniles by Ms. Barcher's, but the physical evidence was overwhelming in this case as well. Well, physical evidence was clear that she had committed homicide. But the piece that turns out to be critical is the intent to rob. And I think we still have the problem, the distinction that was just raised that she participated in taking something. But what evidence what other evidence other than the juvenile hall statements? What other evidence is there that she entered with the intent to rob? And I don't think the physical evidence speaks to that very well. It could be circumstantially relied upon, but the stronger evidence were the statements, Your Honor. I agree with you. The jury's conclusion to that effect would certainly be upheld based simply upon the physical evidence. But for a harmless error standard, it seems to me the physical evidence kind of falls short unless you can get to the juvenile hall statements. And so we'd have to deal with those issues. Yes. And those juvenile hall statements were properly admitted. Even though we did we didn't address the expert witness cross examination. If the court has any questions with that regard, I'd be more than willing to address them. If not, we'll submit on the argument. Thank you. Thank you. Page 140 of our excerpts. While Detective Grappoli is questioning her, he says, did you go over to the house for any reason? And her response, it says sound, but she was groaning throughout this. And he says at that point, the doctor was going to come in and fix that. Also at page 89. In other words, we need to get the doctor to come in here right now and take care of this. He's suggesting we need to know why you went over to that house. She's groaning and he says the doctor will come and fix that. Also, I'm going to on page 89 of the excerpts, it says you're a little bit upset right now. I can understand why I'm going to let you go for a while unless Mark. That's the other detective has something to talk to you about. And I want to get the doctor in here and to treat your injuries. And I'll talk to you a little bit later. OK. So he's suggesting that it was important that you recognize that these injuries were worsening, which the evidence shows it's probably not the clear the strongest factor we have. But this was a case where this girl had been chewed up. Her. She was bleeding severely. The officer knew about it and did nothing about it and told her he would take care of it. Get the doctor in when he was. First statement says I want to get a doctor in here. That doesn't tell us what. Yeah, let's talk about this. And then I'll get the doctor in here. What happened? How long was it between that time and the time? The second quote that I gave you was that the was more toward the end. This was well into the into the interview shortly before it ended. Both were well into the interview. Right. One was five pages in the interrogation transcript in front of the other. And it was the better for our purposes. Recognizing she's groaning. He says, you know what, I need to know why you went over there and we'll get the doctor in here to take care of that. He didn't sit there and overtly tell her I am not going to bring treat your injuries until the doctor comes. But nevertheless, I think that's an inference from the record. Again. And with that, your honor, we believe that this is a more egregious case than the facts in Taylor or quite frankly, in any case that I've read. And we believe that it's an appropriate case for. Thank you. This case will be submitted. Court will stand in recess for the day.
judges: Reinhardt, Clifton, Weiner